## A06A2200. DAVENPORT et al. v. CUMMINS ALABAMA, INC.

(644 SE2d 503)

ELLINGTON, Judge.

Benny Davenport filed this action against Cummins Alabama, Inc., Precision Husky Corporation, Bristol Timber Company, and Bobby Moore (Bristol Timber's president) for injuries he suffered after a whole tree chipper he was operating caught fire.[1] Cummins Alabama moved for summary judgment, arguing that it cannot be held strictly liable because it did not manufacture the allegedly defective chipper and that it had no duty to discover any defect. Cummins Alabama also moved to strike the expert affidavit Davenport filed in opposition to the summary judgment motion. The trial court granted Cummins Alabama's motion to strike the expert affidavit after finding that the affidavit "contains inadmissible statements and fails to create an issue of fact" for the case. The trial court also granted Cummins Alabama's motion for summary judgment.[2] Davenport appeals, contending the trial court erred in granting Cummins Alabama's motion to strike and that questions of material fact remain regarding whether Cummins Alabama qualifies as a manufacturer of the chipper and whether it negligently performed or failed to perform a duty to inspect. For the reasons that follow, we affirm.

"On appeal from the grant of summary judgment [the appellate court] conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party,

---

[1] In the same action, Davenport's wife, Karen, asserted a claim for loss of consortium. The trial court's order applied to her claim as well, and she joins in this appeal.

[2] The remaining defendants did not move for summary judgment and the case against them remains pending below.

warrant judgment as a matter of law." (Citation and punctuation omitted.) *Munroe v. Universal Health Svcs.*, 277 Ga. 861, 864-865 (2) (596 SE2d 604) (2004).

Viewed in the light most favorable to Davenport, the record shows the following undisputed facts. In March 2000, Bristol Timber hired Davenport, as an independent contractor, to supply a chipping crew to cut timber, make wood chips on site, and transport the chips to the buyer. Bristol Timber provided Davenport and his crew with a chipper to use. On March 31, 2000, the chipper caught fire while Davenport was operating it, and Davenport was severely injured.

Although Davenport cannot remember the events leading up to his injury, there was an eyewitness, Daniel Wehunt. Wehunt testified that, when he was getting ready to leave the site after filling the chipper with fuel, he saw a fire the size of a basketball on the engine behind and below the operator cab. At this time, Davenport was in the operator cab located six to eight feet off the ground and the engine was running. Wehunt turned away to get a fire extinguisher from his truck, and when he turned back a few seconds later, he saw a white cloud, which he believed to be hydraulic fuel vapor, with a 20-foot diameter. Within seconds, the cloud ignited, and the force of the explosion knocked Wehunt to the ground. After the explosion, Wehunt found Davenport lying in flames on the ground partially underneath the chipper.

Davenport filed his personal injury and product liability action against Bristol Timber, which owned the chipper, and its president; Precision Husky, which designed and assembled the chipper and sold it to Bristol Timber in 1995; and Cummins Alabama, which sold Precision Husky the engine it installed in the chipper. In this litigation, Davenport posits that a hose carrying hydraulic fluid near the engine ruptured, creating a cloud of flammable vapor, which was ignited explosively by the hot engine. Davenport contends that the design of the chipper was defective, specifically as to the location of the hydraulic pumps near the engine, in the use of soft, flexible tubing that could rupture to carry the hydraulic fluid, and in the use of flammable hydraulic fluid. Davenport's strict liability claim turns on the issue of whether an agent of Cummins Alabama actively participated in the design of the allegedly defective chipper such that Cummins Alabama is properly considered a manufacturer of the chipper subject to strict liability. See Division 1, *infra.* In this regard, Davenport contends that Cummins Alabama's "director of engineering" actively participated in the design of the chipper by directing the company that assembled the chipper to locate the chipper's hydraulic pumps in close proximity to the engine without also advising the assembling manufacturer to eliminate the possibility that flexible

tubing carrying hydraulic fluid to and from the pumps would rupture and spray flammable hydraulic fluid on the hot engine.[3]

Davenport's alternative general negligence claim turns on the issue of whether Cummins Alabama undertook a duty to perform a safety inspection of Precision Husky's chippers that incorporated components Cummins Alabama sold such that the Good Samaritan or voluntary duty doctrine, Restatement (Second) of Torts § 324A, required Cummins Alabama to perform the inspection with due care. See Division 2, infra. He faults Cummins Alabama for not noticing during an engine installation review that the flexible hoses were located close to the engine and recommending to Precision Husky that it use hard tubing to prevent hoses from rupturing and spraying hydraulic fluid all over the hot engine.

For many years, Precision Husky has manufactured chippers of various sizes and configurations for different applications. To manufacture a chipper, Precision Husky mounts engines purchased from other manufacturers, as well as customer-ordered accessories and other equipment, on its own frame. The chipper at issue in this case was a Precision Husky Model 2366 Whole Tree Chipper which was powered by an engine manufactured by Cummins Engine Company (which is now known as Cummins, Inc.) and sold to Precision Husky in 1995 by Cummins Alabama, a Cummins Engine distributor. Lee Aured served as the "director of engineering" for Cummins Alabama from 1970 until 1996. In that capacity, Aured marketed Cummins Engine's products to original equipment manufacturers for installation in their products.[4] Based on information supplied by the original equipment manufacturer, Aured would determine whether an engine manufactured by Cummins Engine would work in a particular machine. Aured would consider whether a particular engine would supply the required horsepower and whether the product design would allow the engine to have "enough air, fuel, and water to live." To do this, Aured would obtain information about such factors as the product's cooling system, electrical system, battery capacity, and engine mount. To determine whether an engine would supply enough horsepower, Aured would need to know the primary load (on a chipper, spinning the chipper disk), as well as the maximum amount and the placement of the load from any accessories, such as hydraulically-operated loaders, air compressors, or battery-charging alternators.

---

[3] Davenport did not assert a claim for professional negligence based on the conduct of any engineer involved in the design of the chipper and did not attach an expert affidavit to his complaint. See OCGA § 9-11-9.1 (affidavit required for complaints alleging professional negligence).

[4] Aured held a bachelor's degree in mechanical engineering. The record is silent as to whether he was, at the relevant time, a licensed engineer.

With regard to hydraulic pumps, Aured's concern ended when he knew how much load they had on the engine, where it was applied, and where the hydraulic pump was installed relative to the engine.

Cummins Engine required Cummins Alabama to conduct an engine installation review when an original equipment manufacturer used a Cummins engine in a new machine or used a different Cummins engine in an already existing machine. According to Aured, the purpose of an engine installation review was to make sure that the engine was installed in the machine in a manner that met Cummins Engine's minimum requirements or limits for the engine. The engine installation review was limited to identifying aspects of the engine installation that might affect the engine's reliability, durability or performance in that application. The goal was to ensure that the engine would perform as well as possible and to avoid creating "a product that will damage the engine or wear it out prematurely."

The engine installation review document provided to Cummins Alabama by Cummins Engine states:

> The review is not intended to be a substitute for prototype performance and durability testing by the manufacturer of the machine and shall in no way constitute a warranty or other legal obligation of Cummins Engine Company.

> Although the engine installation interfaces with various other systems in the equipment, there are several factors that an engine Installation Review cannot be expected to address and have not been evaluated unless specifically noted in this report[, including] . . .

> Conformance of the equipment to legislated or regulatory requirements regarding such areas as design, safety and noise levels.

In 1983 or 1984, Cummins Alabama bought a new type of clutch to install on Cummins Engine's higher horsepower engines and supplied it to Precision Husky on a test basis. Use of the new clutch opened up an area at the back of the engine where hydraulic pumps could be placed and where they could draw unlimited power from the engine by attaching to the main drive shaft. Previously, Precision Husky's lighter duty chippers attached the hydraulic pumps to a "pad mount" hydraulic drive on the front of the engine. As Precision Husky began using engines with more horsepower, the hydraulic pumps got bigger and had reached a limit on the capacity of the pad mount hydraulic drive on the front of the engine. Because Cummins Engine

paid for the expensive repairs required by this problem, Aured told Precision Husky representatives they would have to relocate the hydraulic pumps to the rear of the engine, and they did so. Representatives of Precision Husky made all the design decisions relating to the change, with no input from Aured about the hydraulic piping materials or "the location of hydraulic pipes relative to the heat that was coming off this Cummins engine."

In 1992, Aured sent a letter to Precision Husky stating, "The last review of your Chipper Application was in 1985, so it is high time we revisited, particularly in light of recent changes in pump drives and hydraulic systems." After sending this letter, Aured performed an engine installation review of one of Precision Husky's chippers which, although it was not specifically a Model 2366 Whole Tree Chipper, used a Cummins engine equivalent to the one in the Model 2366 and had hydraulic pumps mounted in the same location at the rear of the engine.

After Cummins Alabama moved for summary judgment, arguing that it was a mere product seller[5] and that it had not undertaken any duty to inspect, Davenport submitted an affidavit from Charles E. Benedict, P.E., Ph.D., in opposition. In his affidavit, Dr. Benedict opined that the design of the Precision Husky Model 2366 Whole Tree Chipper was defective in several respects. Dr. Benedict also opined that a properly performed installation review would have addressed these design defects. The trial court granted summary judgment to Cummins Alabama based on its conclusion that Cummins Alabama was a product seller that had no prior knowledge of a dangerous condition.

1. Davenport contends that questions of material fact remain regarding whether Cummins Alabama is a manufacturer of the chipper subject to strict liability under OCGA § 51-1-11.

OCGA § 51-1-11 (b) (1) provides:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was

---

[5] It is important to note that Davenport does not contend that there was any defect in the product that Cummins Alabama sold, that is, the engine that was a component in the chipper that burned. Thus, Cummins Alabama is not a "product seller" vis a vis the allegedly defective product at issue. In the context of this litigation, it is more accurate to describe Cummins Alabama as the distributor of a component part.

not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

"OCGA § 51-1-11 (b) . . . is in derogation of common law and[, therefore,] must be strictly construed or limited strictly to the meaning of the language employed and not extended beyond plain and explicit terms." (Citations and punctuation omitted.) *Daniel v. American Optical Corp.*, 251 Ga. 166, 167 (1) (304 SE2d 383) (1983). Thus, strict liability applies only to those actively involved in the design, specifications, or formulation of a defective final product or of a defective component part which failed during use of a product and caused injury. OCGA § 51-1-11.1 (b) ("For purposes of a product liability action based in whole or in part on the doctrine of strict liability in tort, a product seller is not a manufacturer as provided in Code Section 51-1-11 and is not liable as such."[6]); *Farmex, Inc. v. Wainwright*, 269 Ga. 548, 549-550 (501 SE2d 802) (1998); *Ellis v. Rich's, Inc.*, 233 Ga. 573, 577 (212 SE2d 373) (1975); *Buchan v. Lawrence Metal Products*, 270 Ga. App. 517, 519-521 (2) (607 SE2d 153) (2004); *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891, 894 (1) (a), (b) (605 SE2d 384) (2004); *Buford v. Toys R' Us*, 217 Ga. App. 565, 566 (1) (458 SE2d 373) (1995); *Giordano v. Ford Motor Co.*, 165 Ga. App. 644, 645-646 (2) (299 SE2d 897) (1983). See also Jane F. Thorpe et al., Georgia Products Liability Law, §§ 2-2, 10-6, 10-9, 10-11 (3d ed.).

Davenport contends that Cummins Alabama was actively involved in the design and specifications of the defective chipper, and therefore qualifies as a manufacturer of the chipper, because it "directed" Precision Husky to relocate the hydraulic pumps "in dangerous proximity to very hot engine parts where a foreseeable leak of hydraulic fluid would ignite a fire." But the evidence of record belies this argument and supports only one conclusion: Cummins Alabama did not actively participate in the conception, design, or specification of the chipper.[7] Cummins Alabama's only input into the

---

[6] A "product seller" is statutorily defined as

a person who, in the course of a business conducted for the purpose leases or sells and distributes; installs; prepares; blends; packages; labels; markets; or assembles pursuant to a manufacturer's plan, intention, design, specifications, or formulation; or repairs; maintains; or otherwise is involved in placing a product in the stream of commerce. This definition does not include a manufacturer which, because of certain activities, may additionally be included within all or a portion of the definition of a product seller.

OCGA § 51-1-11.1 (a).

[7] See *Nelson v. C. M. City, Inc.*, 218 Ga. App. 850, 852-853 (2) (463 SE2d 902) (1995), rev'd in part, *NEC Technologies v. Nelson*, 267 Ga. 390 (478 SE2d 769) (1996), further explained,

design was limited to saying, in essence, that the particular engine would perform adequately in a chipper with the intended hydraulic load only if the hydraulic system was connected to the main drive shaft at the rear of the engine and not to a front or pad-mounted hydraulic drive at the front of the engine. The trial court correctly concluded that, as a matter of law, such input does not constitute the type of active role in the design of the final product as will subject the distributor of a component part to liability as a manufacturer of the allegedly defectively designed product. See *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. at 894 (1) (b) (affirming summary judgment on strict liability claim in favor of a forklift distributor even though an agent of the distributor served on the advisory board for the manufacturer's design team and "made suggestions for the design of the forklift," some of which were used in the design).[8]

In addition, Davenport presented no evidence or opinion testimony that the chipper was defective because of the location of the hydraulic pumps. The plaintiff's own expert witness, Dr. Benedict, acknowledged during his deposition that the risk of fire did not arise from the location of the hydraulic pumps at the back of the engine. As he deposed, "If it's plumbed right, you can safely put [the hydraulic pumps] anywhere." In his opinion, the risk of fire related to the connection of flexible tubing to the hydraulic pumps, as opposed to hard piping with shielded flexible tubing in locations where the tubing had to bend. It is undisputed that Cummins Alabama had nothing to do with the choice of materials for the hydraulic piping or the placement of the hydraulic piping on the machine.

As a result, Cummins Alabama is entitled to judgment as a matter of law on Davenport's claim based on a manufacturer's strict liability. *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. at 894 (1) (b).

2. Davenport contends that questions of material fact remain regarding whether Cummins Alabama undertook a duty to inspect Precision Husky's chipper and negligently performed or failed to perform that inspection. In Georgia, the tort of "negligent inspection" is defined in terms of the requirements laid down by Section 324A of

---

*Nelson v. C. M. City, Inc.*, 229 Ga. App. 141 (493 SE2d 569) (1997) (product seller which is actively involved "in the conception, design, or specification of the product" is a manufacturer). See also *Dean v. Toyota Indus. Equip.*, 246 Ga. App. 255, 257 (540 SE2d 233) (2000) (jury question existed on issue of strict liability where there was a "lack of clarity" regarding which entity designed allegedly defective forklift).

[8] Cf. *Buchan v. Lawrence Metal Products*, 270 Ga. App. at 521 (2) (evidence that a seller of a crowd control system had an active role in the design and production of the product precluded summary judgment on the issue of whether it was a manufacturer under OCGA § 51-1-11 (b), where there was evidence that the seller chose the retractable tape cassettes and other components of the posts, purchased the components from different manufacturers, and assembled the units according to its own design).

the Restatement (Second) of Torts, which addresses the liability to a third person for the negligent performance of an undertaking. *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588, 589-592 (322 SE2d 269) (1984); *Sims v. American Cas. Co.*, 131 Ga. App. 461, 468-473 (4) (206 SE2d 121) (1974), aff'd sub nom., *Providence Washington Ins. Co. v. Sims*, 232 Ga. 787 (209 SE2d 61) (1974).[9] Georgia courts have found jury questions on the tort of negligent inspection claimed against insurers where the evidence showed that an insurer undertook to inspect and correct or warn against workplace hazards such as malfunctioning boilers or hazardous chemicals. See *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. at 590-592 (high pressure hose at car dealer); *Cleveland v. American Motorists Ins. Co.*, 163 Ga. App. 748, 752 (2) (295 SE2d 190) (1982) (steam-generating boiler at power plant); *Argonaut Ins. Co. v. Clark*, 154 Ga. App. 183, 185-188 (2) (267 SE2d 797) (1980) (unstable slope on construction site); *Sims v. American Cas. Co.*, 131 Ga. App. at 468-473 (4) (volatile chemical in a manufacturing reactor).

In this case, Davenport claims that Cummins Alabama's failure to exercise reasonable care in performing a safety inspection of the Model 2366 Whole Tree Chipper increased the risk that a chipper would catch fire and harm an operator such as Davenport. But the record is devoid of any evidence that Cummins Alabama undertook to perform a safety inspection of any Precision Husky chipper. Rather, the undisputed evidence shows that the inspections associated with a Cummins Alabama engine installation review involved the installation's impact on engine performance only. Section 324A of the Restatement will not support a cause of action based on the theory that a party who did not undertake to render services *should have* done so. *Finley v. Lehman*, 218 Ga. App. 789, 790-791 (1) (463 SE2d 709) (1995). Because the undisputed evidence shows that Cummins Alabama did not undertake to render services to another which it should have recognized as necessary for the protection of a third person or his things, Cummins Alabama is entitled to judgment as a matter of law on Davenport's negligent inspection claim based on Section 324A of the Restatement. Id.

---

[9] Those requirements are as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Huggins v. Aetna Cas. &c. Co.*, 245 Ga. 248, 249 (264 SE2d 191) (1980) (adopting Restatement (Second) of Torts, Section 324A).

3. Davenport contends the trial court applied an incorrect legal standard to Cummins Alabama's motion to strike. It is undisputed that Dr. Benedict lacked any personal knowledge of the operative facts of this case. To the extent his affidavit contained statements of fact regarding the conduct of agents of Cummins Alabama and Precision Husky in the design, manufacture, inspection, or maintenance of the chipper at issue, such statements may not be considered in conjunction with Davenport's opposition to Cummins Alabama's motion for summary judgment. On the other hand, to the extent his affidavit contained statements of his opinion, as an expert, relating to the standard of care and like matters, any error in striking the affidavit is moot in this appeal because Cummins Alabama is entitled to judgment as a matter of law, even when Dr. Benedict's opinions are considered. See Divisions 1 and 2, supra.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED MARCH 29, 2007.

*Boone & Stone, William S. Stone, Antoinette Davis*, for appellants.

*Weissman, Nowack, Curry & Wilco, Leigh M. Wilco, Todd E. Hatcher*, for appellee.