29566. MILLIGAN *v.* GEORGIA POWER COMPANY.

270

DECIDED OCTOBER 13, 1942.    REHEARING DENIED NOVEMBER 12, 1942.

*J. B. Edwards, Arnold, Gambrell & Arnold,* for plaintiff.
*Barry Wright, Jack Rogers, W. W. Mundy,* for defendant.

SUTTON, J.   1.   The plaintiff contends that under the evidence a jury question was presented, and that the defendant power company could be held liable for the plaintiff's injury either (1) on the theory that it had control or joint control of the current on the premises of the customer, Cedartown Textiles Inc., including the exposed wire with which the employee came in contact, even though the customer owned the wiring and the defendant had no notice of the defective and dangerous condition thereof, or (2) because, irrespective of control, the defendant had notice and yet failed to make an initial inspection before turning on the current, or (3) because, after receiving notice of such dangerous and defective condition of the wiring, it continued to send its current through the wires.

It is the general rule, deduced from the authorities, that where wiring, or other electrical or gas appliances on private property, is owned or controlled by the owner or occupant of the premises, a company which merely furnishes electricity or gas for such respective appliances is not responsible for the insulation of the electrical appliances or the condition of the wiring or electrical or gas appliances, and is not liable for injuries, caused by such defective condition, to the owner or occupant or to third persons on

the premises. The rule is subject to the exception that, whenever such electric current or gas is supplied with actual knowledge on the part of the one supplying it of the defective and dangerous condition of the customer's appliances, he is liable for injuries caused by the electricity or the gas thus supplied for use on such defective and dangerous appliances, but no duty of inspection rests on the one supplying the electricity or the gas from the mere fact of rendering such service to the customer owning or controlling the equipment. Where the one supplying the electricity or the gas has no control over the appliances and has no actual knowledge of the defective and dangerous condition thereof, his responsibility ends when connection is properly made under proper conditions and the current of electricity or the gas is delivered in a manner which will protect both life and property. *Scott* v. *Rome Railway & Light Co.*, 22 *Ga. App.* 474 (96 S. E. 569); *Hatcher* v. *Georgia Power Co.*, 40 *Ga. App.* 830 (151 S. E. 696); *Georgia Power Co.* v. *Kinard*, 47 *Ga. App.* 483 (170 S. E. 688); *Metz* v. *Georgia Public Utilities Cor.*, 52 *Ga. App.* 771 (184 S. E. 629); *Cornett* v. *Georgia Public Utilities Co.*, 63 *Ga. App.* 305 (11 S. E. 2d, 68); 18 Am. Jur. 498, § 102; 29 C. J. S. 611, § 57.

It conclusively appears from the evidence that the wiring throughout the buildings of the customer was installed and paid for by it, and there is no evidence that the power company did not make safe and proper connections for the transmission of its electrical current. The wire to the water tank was installed by Cedartown Textiles Inc. a year or more after the current was turned into the customer's system of wiring and equipment, and there is no evidence that the power company knew of the existence of such tank wire until sometime after the plaintiff was injured. It follows that the power company did not supply the current of electricity with any actual knowledge of any defective and dangerous condition of the wire at the water tank. The contention of the plaintiff, that certain information communicated to a meter reader as to the condition of one or more wires at or near the transformer was sufficient to place the power company under a duty to inspect and become aware of the defective and dangerous condition of the wire at the tank, is without merit. Whatever notice this meter reader acquired was only constructive notice at most, and could not be said to charge the defendant with

actual notice of the defective and dangerous wire which injured the plaintiff. A witness, Blankenship, testified that he was a yard employee of the customer, and that several months before the injury to the plaintiff a meter reader, whom he identified at the trial, came to read the power company's meter, and that there was "a transformer hanging up over the door with some kind of naked wires on the side," and he asked the meter reader "Ain't them wires supposed to be wrapped?" and the meter reader answered "If there is anything on it, it is," whereupon Blankenship said to him "If you will just look around, you will see a whole lot of wires that way," but specified no place to go to. The evidence wholly fails to show by the witness or any one else that any of the wires referred to had been charged, or were then charged, with a current of electricity. So far as it appears, they may have been wires which had been abandoned as conveyors of electricity, if they had ever been so used, and it can not be presumed, as argued by the plaintiff, that they were charged with electricity.

Furthermore, the meter reader was not such a person as that notice to him of any defective and dangerous wiring would bind his employer. The plaintiff refers to certain written instructions given him by the power company in connection with his job as meter reader, and argues that such instructions show that he was under a duty to inspect and report to the company any existing defect in the wiring. Without entering into a detailed discussion of these written instructions, which are set forth in the statement of facts hereinbefore, it must be said that, properly construed, they related only to a duty to inspect and report on the equipment and wiring belonging to the power company, in connection with his duty of reading the meter at the substation, and suggest no duty of inspecting or repairing the wires installed by the customer.

Without actual knowledge of the defective and dangerous condition of the wire at the water tank, which wire was installed after the electric current was first turned on the wiring system in the mill buildings of the customer, the defendant was under no duty to inspect the wiring and was not negligent in continuing to send the current of electricity over the wires of the customer unless it had control of the current through the customer's wiring system and appliances. The plaintiff contends that such control is shown to have existed. We do not think so. Neither the tes-

timony of J. H. Smith, the mill electrician, nor that of A. P. Gilmore, district manager of the power company, particularly relied on by the plaintiff in his brief, nor that of any other witness raises any question which would require a submission of such alleged issue to a jury. The testimony is set forth in detail in the foregoing statement of facts and need not be repeated. It shows in substance the following as to control: The power company erected a substation on the premises of the mill. This was entirely enclosed by a wire fence, and the equipment was that of the power company. High voltage came into the substation from the wires of the power company, and by a transformer located at the substation was reduced to a lower voltage for use by Cedartown Textiles Inc. after passing through a meter installed at its substation by the power company. At the substation was erected a switch on the high-voltage side of the line. The incoming current of electricity reaches this switch before it reaches the transformer or the power company's meter. On the low-voltage side of the transformer are located two other switches. Before the current of electricity reaches a point on the wire where these two switches are located it has already passed through the meter. Inside the mill buildings are two other switches. The current that reaches the exposed wire at the water tank comes from a wire in one of the mill buildings and is controlled by a switch therein. The power company never had access to any of the switches in the mill buildings, and it never undertook to repair the wires or equipment inside any of the buildings. It is not shown to have been aware of the existence of any wire at the water tank at the time of the plaintiff's injury. The only place where the power company has a switch is, as already stated, at the substation on the high-voltage side of the transformer, and the current of electricity reaches it before it does the meter. By using that switch the power company could cut off all current from the customer. According to testimony of J. H. Smith, electrician for the mill, the current is delivered to Cedartown Textiles Inc. at the meter at the substation, and all the current that goes through the meter is paid for by the customer, and it is used and controlled from that point on by Cedartown Textiles Inc. The plaintiff refers to the witness, A. P. Gilmore, as testifying that the power company "controlled the current which went into the mills from a

switch mounted on the substation structure which is controlled from the ground." The quoted statement is somewhat inexact, in that the record shows that he testified "We have control of it [the current] as it comes into the substation on the mill property," etc. This is not equivalent to testifying that the power company controlled the current "which went into the mills." The current was controlled by the power company, according to the witness, "as it came into the substation."

Nor do the provisions of the contract between the power company and the customer, numbered 11, 12, and 14, evidence, as contended by the plaintiff, any control or joint control by the power company of the mill's system of wiring and appliances. Paragraph 11 merely shows an agreement on the part of the customer that the apparatus used by it in connection with the electrical energy to be supplied by the power company shall be of standard make, etc., a condition which the power company might reasonably exact without putting itself in the position of having control over such apparatus, equipment, or current after purchase and installation of such apparatus and equipment by the customer. Paragraph 12 merely provides that the wires upon the premises of the customer "to which the company's services will be connected" shall be so installed, changed, and maintained by the customer to enable the power company to carry out the contract and furnish the desired service and be in accordance with the requirements of any public authorities or insurance agencies exercising authority thereover. It also gives the power company the right to install and maintain a substation on the premises of the customer, with the privilege of keeping in repair or removing its property or inspecting its own or the customer's wires, reading meters or performing any other work incidental to rendering the service contracted for, but it does not put any *duty* on the power company to inspect or show in the power company a right of control of the customer's wiring system and appliances. On the other hand, it places upon the customer the duty of maintaining its wires, etc. to enable the power company to properly carry out its contract of furnishing the necessary electrical energy. Paragraph 14 does not indemnify or seek to indemnify the power company against its negligence which, if it did, might, as argued by the plaintiff, suggest some control by the power company, but

provides for indemnity from the customer for the payment of any sum which it might be called on to pay on account of damage to property or fatal or personal injuries to individuals resulting from or which may be in any way caused by the operation and maintenance of the apparatus, appliances, etc. belonging to the customer. Notwithstanding the fact that an employee might be injured by a defective and dangerous condition of the mill's wiring or appliances under circumstances where, under the law hereinbefore stated, the power company would not be liable, it might anticipate that it might nevertheless be made a defendant in an action for recovery of damages by the injured employee, and it provided by contract, not against its own negligence, but for indemnity by the customer for any damage so sustained. Neither this paragraph by itself nor in connection with any other paragraph or paragraphs of the contract shows any control, single or joint, or right of control, by the power company of the mill's system of wiring and appliances.

The contention that the power company was negligent in not having a printed sign or other form of warning at the ladder at the water tank to warn persons of the danger from the uninsulated wire was not sustained by the evidence, in that, for reasons hereinbefore shown, the power company was not in control of such wire and no duty rested on it to erect such a sign or form of warning. Furthermore, it is not shown to have been aware of its existence, the wire having been run by Cedartown Textiles Inc. a year or more after the current was first turned on by the power company, and it had no actual knowledge thereafter of any such defective and dangerous wire at the water tank.

2. The evidence failed to show any actionable negligence on the part of the defendant, and the court did not err in granting a nonsuit.

3. The assignment of error on the admission of testimony from the mill 'electrician, J. H. Smith, that at the point where the current of electricity flowed through the meter of the power company it was delivered to Cedartown Textiles Inc. and from then on was its current, the ground of objection being that the testimony was a conclusion of the witness and that the question should have been resolved by a jury, is without merit. The testimony

was as to a fact, so patent that any discussion would be supererogation.

*Judgment affirmed. MacIntyre and Felton, JJ., concur.*