**CITY OF MOULTRIE, Appellant,**

v.

**Mrs. Louise POOLE, Appellee.**

**No. 17184.**

United States Court of Appeals Fifth Circuit.

Oct. 24, 1958.

Hoyt H. Whelchel, Hoyt H. Whelchel, Jr., Whelchel & Whelchel, Moultrie, for City of Moultrie, appellant.

Vincent P. McCauley, Columbus, Ga., Marcus B. Calhoun, Forester & Calhoun, Thomasville, Ga., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal presents the sole issue of the sufficiency of the evidence to warrant submission to the jury of the question of negligence resulting in the accidental electrocution of appellee's husband.

The City of Moultrie, Georgia, operates its publicly owned electrical power and light system. At the request of one C. O. Smith it installed a power line wholly on Smith's property. Power was delivered to Smith to a pole owned by him and transmitted across Smith's property at the point where appellee's deceased husband came in contact with the wire. It was undisputed that the "hot" wire was uninsulated. Appellant claims that testimony offered on its behalf established that when the installation was made in 1951 across the roof of the Smith building the wires were at least eight feet above the highest part of the building. This was the top of a steel frame housing a conveyor. Mr. Poole was electrocuted when doing repair work on the roof on this conveyor housing. Appellant contends that an eight-foot clearing under the circumstances constitute such proper installation as would preclude a finding by a jury that such installation was negligent.

Appellee contests the assertion that the testimony established without conflict that the clearance was eight feet or more. Appellee also contends that a jury question exists because, so she asserts, the City of Moultrie had notice that at the time it was sending current of 4,000 volts through the wire in question it was sagging within reach of persons on the roof, or at least, under Georgia applicable law, it was put on notice of facts that charged it with the duty to make inspection.

Appellant relies on Milligan v. Georgia Power Company, 68 Ga.App. 269, 22 S.E.2d 662, 668, as entitling it to a reversal of the judgment below:

"It is the general rule, deduced from the authorities, that where wiring, or other electrical or gas appliances on private property, is owned or controlled by the owner or occupant of the premises, a company which merely furnishes electricity or gas for such respective appliances is not responsible for the insulation of the electrical appliances or the condition of the wiring or electrical or gas appliances, and is not liable for injuries, caused by such defective condition, to the owner or occupant or to third persons on the premises. The rule is subject to the exception that, whenever such electric current or gas is supplied with actual knowledge on the part of the one supplying it of the defective and dangerous condition of the customer's appliances, he is liable for injuries caused by the electricity or the gas thus supplied for use on such defective and dangerous appliances, but no duty of inspection rests on the one supplying the electricity or the gas from the mere fact of rendering such service to the customer owning or controlling the equipment. Where the one supplying the electricity or the gas has no control

over the appliances and has no actual knowledge of the defective and dangerous condition thereof, his responsibility ends when connection is properly made under proper conditions and the current of electricity or the gas is delivered in a manner which will protect both life and property. Scott v. Rome Railway & Light Co., 22 Ga.App. 474, 96 S.E. 569; Hatcher v. Georgia Power Co., 40 Ga.App. 830, 151 S.E. 696; Georgia Power Co. v. Kinard, 47 Ga.App. 483, 170 S.E. 688; Metz v. Georgia Public Utilities Corp., 52 Ga.App. 771, 184 S.E. 629; Cornett v. Georgia Public Utilities Co., 63 Ga.App. 305, 11 S.E.2d 68; 18 Am.Jur. 498, § 102; 29 C.J.S. Electricity § 57, p. 611."

Appellee contends that this case is inapplicable because the City of Moultrie was not solely "one supplying the electricity" because the City built the facilities over which the power was transferred. Appellant recognizes that this fact places on it the duty properly to construct the line which it had built for Smith. In its brief here appellant stated its liablity as follows:

"1. It was its duty to properly construct the line which it had constructed for C. O. Smith Guano Company.

"2. It was its duty not to furnish electric current on the line if it had knowledge that the line was defective."

The question thus resolves itself to this: Was there sufficient evidence to warrant the court's submitting to the jury the question where either duty was violated? We think there was.

Without reciting all of the evidence bearing on this issue it is sufficient, we think, to point out that members of the crew who installed the line testified in a manner and to facts from which the jury could conclude that the line was negligently constructed. Witness Wiggins first testified on the trial in response to the question if he knew how much higher the wires were than the frame: "No, sir, they were about, I would say, eight or nine feet." When asked whether he measured the distance, he said: "No, sir, I didn't measure them. That's why I say I don't know." On cross examination he said: "Yes, sir, I say best I remember, now, I believe it was about six or eight feet high, but from being shore [sic], I don't know." His testimony was based on his observation at the position of one of the poles which was some 135 feet from the conveyor roof. It is not plain as to how he made his estimate, but he testified elsewhere that looking down the length of the wire which ran some 277 feet there was a sag "about a foot, might have been a foot and a half. I was just looking down it."

The witness Moree, who was the superintendent of the crew testified that there was a clearance of eight feet over the conveyor roof. However, his testimony was inconsistent in that he later said that the way he estimated this clearance was that he looked upward along a 48-foot pole and that there was a clearance of eight feet between the *top of the pole* and the conveyor frame.[1] It had previously been testified without dispute that the measurement from the ground to the top of the conveyor roof was only 32 feet. Thus Moree's testimony that there was a clearance of

1. The following testimony by Moree on cross examination shows the inconsistency in his testimony:
"Q. Mr. Moree, you have come into Court here today and said that these lines, when you strung them, were 8 feet above the conveyor. A. Yes, sir.
"Q. How do you know they were 8 feet? A. Measured 'em.

"Q. What with? A. Tree trimmer.
"Q. How do you know how tall the tree trimmer was? A. It's in six foot sections.
"Q. And how many of them did you use to put up there? A. Well, er, we would have to use about 8 sections.
"Q. Where did you stand when you measured them? A. Down side of the

only 8 feet from the top of the roof to the top of the 48-foot pole was clearly so inaccurate that the jury could disbelieve the estimate he made of the clearance between the top of the roof and the wires.

Although both parties dealt with the matter of clearance as though an established eight foot clearance would be standard under the circumstances, no city ordinance was introduced and no other method of establishing an absolute standard was attempted. Therefore, we think whether the installation of live wires which were intended to and did carry current of lethal measure across a building, which the jury could find would occasionally be used by employees, was "properly" done was a question of fact for the jury to determine under all the circumstances. We think that the jury could conclude from the testimony that the defendant did not discharge its admitted duty, taking the evidence of employees of the City themselves. We think it also permissible for the jury to take into consideration the fact that at the time of the installation it was obvious to the City that the building was still under construction. In point of fact a roof was subsequently installed above the conveyor frame which reduced such clearance as did exist by one foot, according to undisputed testimony. The jury could consider whether an installation of the type here constructed did not require a final inspection by the City after the building was completed, since it is conceded that "proper construction" involves reasonable clearance over the highest point over which it passes. Moreover, the plaintiff introduced, without objection evidence showing that Smith had paid a bill submitted by the defendant for materials used in connection with the construction of the power line in question. This statement showed that Smith was charged for the purchase price of two 40-foot poles. Testimony by witnesses for the City was to the effect that a "longer" pole was used at one end of the building and it was undisputed that the poles were sunk approximately 5½ feet into the ground. While not strong evidence on behalf of the plaintiff, we think the fact that at least one of the poles used to carry the wire across the building was only 2½ feet taller than the roof of the conveyor is a circumstance which the jury could consider in determining whether the initial construction satisfied the requirement that it be done with ordinary care under the circumstances.

We conclude that using the test of liability asserted by appellant itself, the evidence presented an issue warranting its submission to the jury.

The judgment is affirmed.

elevator shaft. They—that thing across the railroad.

"Q. You mean down along side of this conveyor frame? A. Yes, sir.

"Q. And you held the thing up in the air, six sections of the tree trimmer? A. Right.

"Q. And you looked up there along this six sections of this pole that you were holding and you said to yourself, 'Now, that's 8 feet above that conveyor.' Is that what you did? That how you measured it? A. That's right.

"Q. In other words, you didn't get up on top of the conveyor and look across on the vertical clearance of that pole, did you? A. I didn't have to.

"Q. You sighted it from the ground? A. From the ground.

"Q. All right, then, er—you had on there, I think you said, about six sec-tions of it from the ground. Right? A. Nope.

"Q. How many? A. I said I had eight, or better. I said I had eight or better.

"Q. Eight or better sections, six feet each, right? A. Yes, sir.

"Q. All right, sir. So that would give you a total of about 48 feet, wouldn't it. Eight times six is forty eight. A. The eight sections would.

"Q. I say 8 times 6 would be 48. Right? A. Yes, sir.

"Q. All right, you're standing on the ground and you've got a 48 foot pole going up in the air and you say there was 8 foot of clearance between the top of that pole and the elevator? A. Yes, sir."