**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 12, 2015**

# In the Court of Appeals of Georgia

A15A1527. GARVIN v. ATLANTA GAS LIGHT COMPANY.　　DO-075

DOYLE, Chief Judge.

Kareem Shamed Garvin suffered severe injuries in a natural gas explosion in an outbuilding on his mother's property. He filed a negligence claim against Atlanta Gas Light Company ("AGL"), which reactivated the gas to the property the day after his mother purchased it, approximately six years before the explosion. Garvin appeals the trial court's grant of summary judgment to AGL, as well as the court's denial of his subsequent motion for reconsideration. We affirm for the reasons that follow.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all

reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[1]

"We will uphold a trial court's decision granting or denying a motion for reconsideration absent an abuse of discretion."[2]

Viewed in the proper light, the record shows that John Gary Busy owned a home in Savannah. In 1982, he erected an outbuilding with a roll-up garage door for use as a workshop, which was located behind the main house, and he subsequently installed a gas line in the outbuilding to fuel a space heater.[3] When Busy sold the property in 1985, he removed the space heater, but he cannot recall whether he capped the gas line at the outbuilding. The property was sold again in 1994 and in 2002.

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[2] *Stephens v. Alan V. Mock Constr. Co., Inc.*, 302 Ga. App. 280, 281 (1) (690 SE2d 225) (2010).

[3] The outbuilding has shutters and siding that match the main house on the property.

In April 2005, Cynthia Sanders, Garvin's mother, purchased the property. Before moving in, she arranged for AGL to re-initiate natural gas service to the property. Greg King, an AGL Field Service Representative with 30 years of experience, arrived to connect the natural gas on April 26, 2005. King's usual practice was to ask the homeowner to point out all of the places where natural gas would be used on the property, and Sanders showed him three appliances – the hot water heater, the stove, and the furnace.[4] After ensuring that the shut-off valve to each of the appliances was turned off, King then conducted a leak test, also known as "spotting the meter." The leak test consists of turning on the gas service to the house at the meter after closing the valves upstream of each gas-fueled appliance and observing the meter for approximately five minutes to determine if there is any gas flowing into the house. The meter had three lines running from the meter, and there were three gas-fueled appliances at Sanders' home. After the leak test did not show any gas flowing into the house, indicating that the pipes were air-tight and free of leaks, King visually inspected the gas appliances, lit the pilot lights, and observed the appliances in operation. Sanders was not aware that there was a gas line to the

---

[4] At his 2012 deposition, King could not actually remember performing any of these tasks at Sanders's home when he reactivated natural gas to the property some seven years before the deposition. Instead, he testified to his usual custom and habit.

3

outbuilding, so she did not notify King about it,[5] and he left without inspecting the structure.[6] Before King reconnected the natural gas at Sanders's property, a prior field agent specifically noted in an accessible computer database the presence of "customer buried piping" at the property. King's field notes from the Sanders's job also reflected customer buried piping.

After Sanders moved into the home, Garvin began spending time in the outbuilding, turning it into a "guesthouse" by adding a television, chairs, and a bed.[7] On July 30, 2011, Garvin invited his girlfriend, Sherri Pratt, over to watch television in the outbuilding as they had done in the past. Garvin turned on the air conditioning, but turned it off after smelling an "odd[,] . . . rotten egg" odor. He turned it on again, and the smell reappeared. Garvin then sat down on the couch and lit a cigarette, igniting the natural gas, and the building exploded. Garvin suffered severe burns in

---

[5] Some time after Sanders moved in, she and Garvin noticed the gas line protruding from the wall in the outbuilding, but they did not recognize it as such.

[6] King spent approximately 30 minutes at Sanders's property.

[7] The outbuilding was serviced by electricity and an air conditioner when Sanders purchased the property.

the explosion, and Pratt died from her injuries.[8] An inspection of the scene after the explosion revealed that the gas line was uncapped, with only a valve at the end.

AGL's Field Service Manual ("the Manual") governs its service personnel's operations, including King's 2005 meter activation at Sanders's property. According to the Manual, "[t]he goal of any meter activation (turn-on) is to complete the order while leaving the premise conditions safe." For field service representatives activating a meter, the Manual requires them to: test the customer's fuel lines by "spotting the meter" for three to five minutes; visually inspect all gas-fueled appliances; list gas stubs with no connected appliances[9]; light the appliances and check for gas leaks and compliance with applicable codes and safety requirements; and leave a warning on those appliances that cannot be safely lit. The Manual does require AGL personnel to cap "all open lines," which are lines that allow the flow of gas and that are revealed when an AGL technician "spots the meter" because open lines leak. A line ending in an uncapped, but closed valve is not an "open line." The Manual does not require AGL field service personnel to trace customer buried gas

---

[8] Pratt's estate claim and wrongful death action are the subject of a separate lawsuit.

[9] A gas line that terminates without being attached to an appliance is commonly referred to as a "gas stub."

lines to their end points to ensure that every pipe connects to an appliance or terminates in a cap.

Garvin filed this negligence action against AGL, alleging that AGL breached its duty to inspect the entire existing natural gas system at Sanders's property, including the shed, discover the hazardous uncapped line to the shed, and cap it. Garvin also asserted a failure to warn claim. AGL moved for summary judgment, and the trial court granted it, concluding that "there was no duty in 2005 for AGL to conduct an inspection of the existing piping system at Ms. Sanders'[s] home and to discover and cap the uncapped gas stub in the outbuilding." The trial court subsequently entered an order denying Garvin's motion for reconsideration, concluding that AGL was also entitled to summary judgment on Garvin's failure to warn and negligence per se claims.[10] This appeal followed.

1. *Negligence claim*. Garvin contends that the trial court erred by granting summary judgment to AGL on his claim that it was negligent in failing to inspect the natural gas pipe system at Sanders's property and to discover and cap the uncapped line running to the shed. We disagree.

---

[10] On appeal, Garvin does not challenge the trial court's grant of summary judgment to AGL on his negligence per se claim.

6

The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages. Thus, the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff. This issue is a question of law. *A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle* declared in the reported decisions of our appellate courts.[11]

On appeal, Garvin contends that AGL breached duties to him arising out of common law and based on its negligent undertaking as established by Section 324A of the Restatement (Second) of Torts.[12]

(a) *Common law*.

---

[11] (Footnotes and punctuation omitted; emphasis supplied.) *Boiler v. Robert W. Woodruff Arts Ctr., Inc.*, 311 Ga. App. 693, 695-696 (1) (a) (716 SE2d 713) (2011).

[12] We note that Garvin also argued to the trial court that AGL breached multiple statutes and regulations, including the National Fuel Gas Code 34 (1996 ed.), which he alleged was adopted by the legislature and the Georgia Department of Community Affairs; the Georgia State Minimum Gas Code (Ga. Comp. R. & Regs. r. 110-11-1-.14); the Georgia State Minimum Fire Safety Standards (Ga. Comp. R. & Regs. r. 120-3-3); the International Fuel Gas Code; and the International Plumbing Code. The trial court rejected this argument, and Garvin does not enumerate this ruling on appeal.

Absent actual knowledge of a dangerous condition, a gas supplier is not generally liable beyond the meter and service pipes.

> [W]here wiring, or other electrical or gas appliances on private property, is owned or controlled by the owner or occupant of the premises, a company which merely furnishes electricity or gas for such respective appliances is not responsible for the insulation of the electrical appliances or the condition of the wiring or electrical or gas appliances, and is not liable to the owner or occupant or to third persons on the premises for injuries, caused by such defective condition. The rule is subject to the exception that whenever such electrical current or gas is supplied with actual knowledge on the part of the one supplying it of the defective and dangerous condition of the customer's appliances he is liable for injuries caused by the electricity or the gas thus supplied for use on such defective and dangerous appliances, but no duty of inspection rests on the one supplying the electricity or the gas from the mere fact of rendering such service to the customer owning or controlling the equipment.[13]

---

[13] (Punctuation omitted.) *Young v. Blalock Hauling Co.*, 106 Ga. App. 590, 594 (127 SE2d 689) (1962), quoting *Milligan v. Ga. Power Co.*, 68 Ga. App. 269 (1) (22 SE2d 662) (1942).

Constructive knowledge on the part of the utility does not give rise to a duty to inspect.[14]

It is undisputed in this case that AGL/King had no actual knowledge of a dangerous and defective condition on the property. As instructed by the AGL Manual, when King reported to Sanders's property to re-initiate gas service, he conducted a leak test by spotting the meter, which indicated no leaks. And knowledge of the existence of the customer installed gas line to the outbuilding, without knowledge of an actual gas leak, is simply insufficient to give rise to a duty on the part of AGL to inspect the line to ensure that it was capped, instead of terminating with a valve.[15]

---

[14] See *Milligam*, 68 Ga. App. at 269 (rejecting argument that constructive knowledge of a defective wires to a meter reader was sufficient to place the power company under a duty to inspect). See also *Ga. Power v. Canard*, 47 Ga. App. 483, 487-488 (170 SE 688) (1933).

[15] See, e.g., *Maynard v. City of Atlanta Gas-Light Co.*, 24 Ga. App. 5, 5-6 (99 SE 472) (1919) (gas company had no duty to inspect gas appliances and pipes in the house and was not negligent for failing to have the fixtures properly connected to prevent the escape of gas). Compare *Bray v. Atlanta Gas Light Co.*, 46 Ga. App. 629 (1) (168 SE 96) (1933) (reversing grant of demurrer to gas company after the plaintiff was injured in a natural gas explosion because the gas company terminated natural gas service to a vacant home knowing that there were unconnected gas lines in the house, and the gas could be easily reconnected by an individual without the assistance of the gas company).

9

(b) *Section 324A of the Restatement (Second) of Torts*. Garvin's argument that AGL owed him a duty under Section 324A of the Restatement (Second) of Torts to search for and cap all uncapped lines is also unavailing.

> Section 324A of the Restatement (Second) of Torts does provide for liability to third persons for negligent performance of an undertaking, and was adopted by the Georgia Supreme Court in *Huggins v. Aetna Cas. & Sur. Co.*[16] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) *his failure to exercise reasonable care increases the risk of such harm*, or (b) *he has undertaken to perform a duty owed by the other to the third person*, or (c) *the harm is suffered because of reliance of the other or the third person upon the undertaking.*"[17] The duty assumed under Section 324A applies only to an undertaking, and it "will not support a cause of action based on the theory that a party who did not undertake to render services *should have* done so."[18]

---

[16] 245 Ga. 248 (264 SE2d 191) (1980).

[17] (Emphasis supplied.) *Bing v. Zurich Svc. Corp.*, 332 Ga. App. 171, 172 (1) (770 SE2d 14) (2015), citing *Huggins*, 245 Ga. at 249 (1).

[18] (Emphasis in original.) *Davenport v. Cummins Alabama, Inc.*, 284 Ga. App. 666, 673 (2) (644 SE2d 503) (2007).

Here, King performed all of the services he undertook to do – spotting the meter to check for leaks, visually inspecting the gas appliances, and lighting the pilot lights and observing the appliances in operation. There is no evidence that King undertook to perform a safety inspection of Sanders's gas pipes, including following them to their endpoints. Under these circumstances, the trial court properly concluded that Section 324A did not give rise to a duty on the part of AGL.[19]

> We further note that none of the subparts of Section 324A apply here.
>
> Subpart (a) applies when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed. Liability does not attach for failing to decrease the risk of harm. . . . [T]he mere failure to abate a hazardous condition – without making it worse – does not trigger the application of Section 324A (a).[20]

There is no evidence here that AGL changed the condition of the valve. Subpart (b) applies only if Sanders owed a duty to Garvin, for which there is no proof. Subpart (c) applies only if Sanders or Garvin relied on AGL, and there is no evidence in the record that either of them did or refrained from doing anything in reliance on AGL.

---

[19] See id.

[20] (Citation and punctuation omitted.) *Herrington v. Deloris Gaulden*, 294 Ga. 285, 288 (751 SE2d 813) (2013).

11

2. *Failure to warn*. Garvin argues that the trial court erred by granting summary judgment to AGL on his claim that AGL failed to warn him of the dangers of an uncapped gas line. Given King's and AGL's lack of superior knowledge that the gas line to the outbuilding was uncapped, AGL is not liable for failure to warn.[21]

3. In light of our rulings in Divisions 1 and 2, we need not address AGL's argument that Garvin's claims are precluded by the liability limitations provided in AGL's tariff approved by the Georgia Public Service Commission.

*Judgment affirmed. Phipps, P. J., and Boggs, J., concur*.

---

[21] See *Gainey v. Smacky's Investments, Inc.*, 287 Ga. App. 529, 532 (2) (c) (652 SE2d 167) (2007).