**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 4, 2019**

# In the Court of Appeals of Georgia

A18A1965. GOODHART et al. v. ATLANTA GAS LIGHT
COMPANY.

MILLER, Presiding Judge.

This appeal arises from the death of Lauren Goodhart, who was found in her

apartment after having suffered an apparent asthma attack. Lauren's estate, along with

her parents ("the Goodharts"), filed a wrongful death lawsuit against Atlanta Gas

Light Company ("AGL"),[1] premised on a gas leak found in Lauren's apartment

around the time of her death. The Goodharts appeal from the trial court's grant of

summary judgment to AGL, arguing that the trial court incorrectly determined that

AGL did not owe Lauren a duty. Because the record shows that AGL did not owe

---

[1] The Goodharts also sued Georgia Natural Gas Company, Greg Poulos, and
Keiji Okada. Poulos was Lauren's landlord, and Okada co-owned the apartment with
Poulos. Georgia Natural Gas Company and Okada were dismissed from the case
without prejudice, and Poulos was dismissed with prejudice.

Lauren a duty under statute or case law, or engage in a voluntary undertaking subjecting the company to liability under the Restatement (Second) of Torts, we affirm.

"To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law." (Citations omitted.) *Beasley v. A Better Gas Co.*, 269 Ga. App. 426 (604 SE2d 202) (2004). Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. Id.

So viewed, the evidence shows that Lauren lived in an apartment in Atlanta. In 2009, the landlord purchased a washer and gas dryer from Home Depot. Home Depot personnel delivered the appliances and "put them in place," the landlord "saw them do some kind of connecting work," and the Home Depot personnel turned on the dryer.

In February 2010, AGL went to the property to activate gas service in the name of Lauren's then-boyfriend, with whom Lauren had been living. The gas meters in this case are located at the rear of the building. Later that year, in October 2010, AGL

2

returned to the property to reconnect the gas after the service was disconnected. At this point, gas service was still in the name of Lauren's ex-boyfriend. Both of the 2010 service orders show that the AGL field service representative "spotted" the meter during the visit, which reveals whether there are any gas leaks. Neither of the 2010 service orders showed a gas leak.

AGL does not install customers' gas appliances. When AGL turns on customers' gas, however, the field service representative does go into the residence, ask the customer to identify the gas appliances in the home, and "check for . . . issues that may be happening." If the representative observes any "codes or violations" that he or she can fix "within [his or her] parameters," the representative "make[s] those adjustments" before turning on the gas. The AGL representative also checks for "issues with combustion." If the representative finds combustion issues, the gas is not turned on.

Lauren began renting the apartment from the landlord in 2011. On the morning of December 31, 2013, more than three years after AGL did the 2010 reconnect, Lauren called 911 to report that she could not breathe and that she suffered from asthma. The following day, Lauren's mother asked Lauren's law partner, Peter New, to check on Lauren because she was not returning her calls. When New went to

3

Lauren's apartment, he found Lauren's body. New noted that the apartment smelled "kind of like eggs" but did not recall smelling any gas in Lauren's bedroom. He testified that Lauren had not been feeling well for approximately a week and a half prior, and had been coughing on the day that he last saw her, which was December 30.

New testified that after he was interviewed, an unknown first responder exited the laundry room and "said that they had found a – like a letter or a – a confirmation of a service call from the gas company." According to New, the person was holding a "piece of paper," and stated "it was from Atlanta Gas Light, and that it indicated that [Lauren] had called previously. And the company had asked her if they thought that the leak was serious, and that she had said that – it was written on there that she said she didn't know." New did not see the contents of the paper and although he is familiar with the AGL trademark, he could not tell if the paper bore the trademark. No reports from first responders mention this paper and it was not submitted to the trial court.

In responding to the scene, fire service personnel noted "a strong odor of gas at the home." A field service representative from AGL was also called to the apartment. Upon examining the rear of the dryer, he observed that "[t]he unit was

leaking from the flex line to the connector," and that the connector had been hand-tightened, rather than tightened using a wrench.[2] The flex connector connects the dryer to the gas line. Tightening and sealing fittings is a part of the installation process.

The AGL representative's "gas tracker" detected "60% LEL [lower explosive limit] coming from [the dryer]," which AGL's operating manual describes as a "dangerous concentration." When the AGL representative "spotted" the meter at the rear of the building, he found that "[t]he meter would not hold its spot" because of the loose "flex line." He turned off the gas valve to the dryer, wrench-tightened and applied pipe sealant to the connector, and turned off the gas to the apartment.

According to the autopsy report, Lauren died from "[b]ronchial asthma exacerbated by bronchopneumonia." The attending forensic pathologist, Dr. Stauffenberg, explained as follows: "the cause of death is asthma and . . . it's made worse by the fact that she has this inflammation on top of the constriction of her airways. That would be the bronchopneumonia." Toxicologic screening tests performed on Lauren were positive for codeine, corresponding with cough syrup that

---

[2] The AGL representative also found that the "venting was not connected" but it does not appear from the record that this would have been associated with a gas leak.

5

Lauren's father had prescribed for her. However, Dr. Stauffenberg testified that the level of codeine in Lauren's blood was "nowhere near enough to be lethal" and she did not believe that the cough syrup played a role in Lauren's death. Dr. Stauffenberg further testified that she did not think that Lauren's death was caused by vitiated atmosphere[3] or natural gas. She added, "[g]enerally[,] that's extremely rare in a residence. Homes, as much as we try to seal them up are usually fairly well ventilated." Rather, she found that "it just looked like a really bad asthma attack with a really strong inflammatory infiltrate." She also explained that blood testing will not detect any "specific chemical that is due to natural gas or even the odorant that's added to it. We can't do testing for that. We can't even test for lack of oxygen because after death everybody loses oxygen. So . . . we can't really confirm that at all by the autopsy."

One of the Goodharts' medical doctor experts testified that "it's at least plausible that the environment was already somewhat compromised with regard to oxygen" such that Lauren had an asthma flare which caused her to become nonresponsive. Another of their medical doctor experts opined that it was more likely

---

[3] "Vitiated atmosphere" means that "oxygen is excluded from the immediate surroundings of the person."

6

than not that the gas leak was a significant contributing factor in Lauren's death, describing the leak as a "domino that fell," "set[ting] off all these other dominoes."

The Goodharts filed a wrongful death lawsuit, naming AGL as one of the defendants. The Goodharts alleged that AGL had been negligent in failing to investigate and correct a hazardous condition on the premises, and in failing to warn Lauren of a dangerous existing condition on the premises. AGL moved for summary judgment, arguing that neither case law nor statute imposes any duty on AGL to inspect or maintain the gas piping and appliances of its customers. Following a hearing, the trial court granted AGL's motion for summary judgment. The trial court found that (1) New's testimony suggesting that AGL had prior knowledge of a gas leak was inadmissible hearsay, and there was otherwise no evidence that the company had such knowledge so as to engender a duty; and (2) Section 324A of the Restatement (Second) of Torts did not give rise to a duty on the part of AGL. This appeal followed.

In interrelated enumerations of error, the Goodharts argue that the trial court erred in not considering New's testimony regarding the first responder's reading of the piece of paper, and also erred in finding that AGL did not undertake a duty to Lauren. These arguments are unpersuasive.

7

The essential elements of a negligence claim are the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages. Thus, the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff. This issue is a question of law. A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts.

(Citation and emphasis omitted.) *Garvin v. Atlanta Gas Light*, 334 Ga. App. 450, 453 (1) (779 SE2d 687) (2015). "In the absence of a legally cognizable duty, there can be no fault or negligence." (Citation omitted.) *Ford Motor Co. v. Reese*, 300 Ga. App. 82, 84 (1) (a) (684 SE2d 279) (2009). "No matter how innocent the plaintiff may be, [s]he is not entitled to recover unless the defendant did something that it should not have done, or failed to do something that it should have done pursuant to the duty owed the plaintiff." (Citation and punctuation omitted.) *City of Douglasville v. Queen*, 270 Ga. 770, 771 (1) (514 SE2d 195) (1999).

Here, the Goodharts contend that AGL's duty to Lauren arose from both statute and common law. Addressing each in turn, we determine that neither gives rise to a duty on the part of AGL.

8

*I. AGL did not owe Lauren a duty under the International Fuel Gas Code*

First, the Goodharts argue that AGL owed Lauren a duty under the International Fuel Gas Code ("Gas Code"), which they contend Georgia has adopted. They do not, however, identify any section of the Gas Code as creating a duty on the part of AGL. They only argue that the Gas Code requires that dwellings have adequate "combustion air," which is purportedly calculated by considering the amount of air required for the combustion of natural gas based on the appliances in use and the size of the space in which the appliances are installed.

But even assuming that this regulation has been adopted as law, the Goodharts fail to explain how it imposes a duty on AGL when the record is clear that AGL does not install customers' appliances, does not "own the customers' installations," and did not install the appliances in this case. The Goodharts' own engineering expert testified that the "combustion air requirement" in the Gas Code provides criteria for the proper *installation* of gas-fueled appliances. In fact, this same expert explained that the Gas Code only requires the gas company to "leak-check the system" "from the meter" when turning on the gas, and the Goodharts do not claim that AGL failed to do so when it went to the residence in 2010.

9

Thus, the Goodharts have failed to identify a statutory enactment imposing a duty on AGL pertaining to examining whether the apartment contained sufficient combustion air.

*II. AGL did not owe Lauren a duty under common law*

*i. Actual Knowledge*

"[N]o duty of inspection rests on the one supplying the electricity or the gas from the mere fact of rendering such service to the customer owning or controlling the equipment." (Citation omitted.) *Garvin*, supra, 334 Ga. App. at 454 (1) (a). In other words, where gas appliances on private property are owned or controlled by the owner or occupant of the premises, a company which merely furnishes gas for the appliances is not responsible for their condition and is not liable for injuries caused by such defective condition. (Citation omitted.) Id. at 453-454 (1) (a). See *Metz v. Ga. Pub. Utilities Corp.*, 52 Ga. App. 771, 771-772 (1) (184 SE 629) (1936) (gas company was not liable for injuries caused by defective condition of gas heater where it was owned and controlled by the customer and the company did not sell or install the heater); *Young v. Blalock Hauling Co.*, 106 Ga. App. 590, 594 (127 SE2d 689) (1962) (gas company delivering gasoline to a filling station has no duty to inspect the station's gasoline storage facilities or the surrounding premises). Compare *Kirby v.*

10

*Atlanta Gas Light*, 84 Ga. App. 786, 786-789 (67 SE2d 413) (1951) (reversing grant of nonsuit to AGL where AGL converted plaintiff's gas stove to use a new type of gas, changed the stove fixtures and equipment, and advised plaintiff that stove was safe for use); *Atlanta Gas Light v. Johnson*, 76 Ga. App. 413, 414-418 (46 SE2d 191) (1948) (upholding denial of demurrer to AGL where AGL allegedly supplied, installed, and repaired the gas-fueled water heater).

"Th[is] rule is subject to the exception that whenever such . . . gas is supplied with *actual knowledge* on the part of the one supplying it of the defective and dangerous condition of the customer's appliances he is liable for injuries caused by . . . the gas thus supplied for use on such defective and dangerous appliances." (Emphasis supplied.) *Garvin*, supra, 334 Ga. App. at 454 (1) (a). "Constructive knowledge on the part of the utility does not give rise to a duty to inspect." (Citation omitted.) Id. It follows, therefore, that "[a]bsent actual knowledge of a dangerous condition, a gas supplier is not generally liable beyond the meter and service pipes." Id. at 453 (1) (a).

Here, the Goodharts do not contend that AGL supplied or controlled any gas appliances or appliance fixtures. Rather, they posit that AGL had actual knowledge

11

of the "overuse of gas-fueled appliances" in the apartment and also knew of the gas leak. This argument lacks merit.

First, the Goodharts point to no evidence that AGL had any actual knowledge of combustion issues stemming from any overuse of gas appliances. And an examination of the record does not reveal that the company had such knowledge. On the contrary, AGL plainly testified that if the field service representative discovers combustion issues, the gas is not turned on.

Second, none of the evidence that the Goodharts cite demonstrates that AGL had prior knowledge of a gas leak. Granted, the record shows that a friend of Lauren, Michael Bixon, visited Lauren's apartment in 2012 and smelled gas. Additionally, Peter New recalled Lauren mentioning that "she had smelled gas and that she had taken care of it." But this testimony fails to show that AGL had actual knowledge of any gas leak. Michael Bixon did not testify that Lauren spoke with AGL about a leak. According to Bixon, Lauren reported a leak to "the super or the manager of the apartment," and "they said that . . . it was just an old place and it occasionally will smell like that." And New confirmed that when Lauren told him she had "taken care of" the gas smell, she did not explain how she had done so, nor did she mention any

12

conversation with AGL. Neither of these two witnesses — or any other witness for that matter — testified that AGL was informed of a gas leak before Lauren's death.[4]

Additionally, contrary to the Goodharts' argument, the trial court properly excluded New's testimony regarding the unidentified first responder reading from the piece of paper on the day that Lauren's body was discovered. "All hearsay evidence, unsupported conclusions, and the like, must be stricken or eliminated from consideration in a motion for summary judgment." (Citation and punctuation omitted.) *Sherrill v. Stockel*, 252 Ga. App. 276, 278 (557 SE2d 8) (2001). The "admissibility of evidence on motion for summary judgment is governed by the rules relating to form and admissibility of evidence generally. We review a trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion." (Citations and punctuation omitted.) *Hungry Wolf/Sugar & Spice, Inc. v. Langdeau*, 338 Ga. App. 750, 751-752 (791 SE2d 850) (2016). Importantly, "hearsay within

---

[4] The AGL representative who inspected the apartment at the time of Lauren's death testified that there appeared to be an old red warning card on the water heater. The Goodharts argue that this card creates a jury issue regarding whether AGL had actual knowledge of the gas leak behind the dryer. This argument is specious because the record is silent as to who placed that specific tag, when it was placed, and the purpose for which it was placed. See *Willingham Loan & Realty Co. v. Washington*, 311 Ga. App. 535, 536 (716 SE2d 585) (2011) ("a motion for summary judgment cannot be denied based on speculation and conjecture.") (citation and punctuation omitted).

hearsay is admissible only if each part of the combined statements conforms with an exception to the hearsay rule." (Punctuation omitted.) *Tuggle v. Rose*, 333 Ga. App. 431, 434 (2) (773 SE2d 485) (2015) (citing OCGA § 24-8-805).

New's testimony presents hearsay within hearsay, each of which must be admissible: (1) the purported contents of the piece of paper indicating that Lauren called AGL about a gas leak; and (2) the first responder's recitation of what was supposedly written on the paper. See *Saye v. Provident Life & Acc. Ins. Co.*, 311 Ga. App. 74, 77 (4) (714 SE2d 614) (2011) (document reflecting phone conversation between appellant and company representative constituted hearsay); *Seed v. Smith & Woods Mgmt. Corp.*, 242 Ga. App. 395, 396 (1) (530 SE2d 29) (2000) ("An alleged statement by an unidentified witness is hearsay and inadmissible. Since the alleged utterer is unknown, it cannot be shown that the statements qualify as being free from all suspicion of device or afterthought.") (citation and punctuation omitted).

First, as to the purported statements in the paper itself, the Goodharts unpersuasively argue that these contents are not hearsay because they are not being offered into evidence to prove the truth of the matter asserted. The statements on the paper partly intimated that Lauren spoke with AGL about a gas leak, and that is precisely the reason the Goodharts are offering New's testimony — to demonstrate

that AGL knew about a gas leak, so as to create a duty. Thus, the contents of the paper qualify as hearsay.

Alternatively, the Goodharts claim that the paper was an AGL record and its contents are subject to the hearsay exclusion for admissions by a party-opponent. See OCGA § 24-8-801 (d) (2). The fundamental problem with this argument, however, is that it presumes that the statements on the paper were in fact made by AGL or one of its agents or employees. See OCGA § 24-8-801 (d) (2) (A), (D) (explaining that the exclusion applies to the party's "own statement" or a "statement by the party's agent or employee"). But New could not say that the paper was an AGL record because he never saw it "up close" and could not tell whether the paper bore any AGL trademark.[5] Compare *Glispie v. State*, 300 Ga. 128, 131 (1) (793 SE2d 381) (2016) (text messages were party's "own statements" because they were sent from his cell phone and "the facts of [the] case indicate[d] that [he] sent the messages."). Because the contents of the paper were inadmissible hearsay, we need go no further to

---

[5] It is of no import that New testified that the first responder said that the paper was from AGL. Again, where there is hearsay within hearsay, *each part* of the combined statements must be admissible. Thus, the contents of the paper must be admissible of their own accord.

15

determine that the trial court did not err when it declined to consider New's testimony regarding the statements he overheard.

Given that there is no evidence that AGL possessed actual knowledge of a gas leak, a defective or dangerous condition with Lauren's dryer, or the supposed overuse of gas appliances, the Goodharts cannot establish a negligence claim based on any failure to inspect. Compare *Johnson*, supra, 76 Ga. App. at 414-418 (plaintiff discussed defective gas appliance and meter with AGL); *Bray v. Atlanta Gas Light*, 46 Ga. App. 629 (1) (168 SE 96) (1933) (reversing grant of demurrer to AGL where AGL terminated gas service to a vacant home and knew that the gas pipes were left open).

## *ii. Restatement (Second) of Torts*

Next, the Goodharts argue that AGL voluntarily undertook various services when it turned on the gas in 2010, which could subject the company to liability under Section 324A of the Restatement (Second) of Torts. Specifically, the Goodharts contend that AGL checked to ensure that gas appliances were connected and working properly, checked for code compliance, and determined whether the space could accommodate the BTU ratings of the gas appliances installed. We determine that the

16

trial court correctly concluded that Section 324A of the Restatement (Second) of Torts did not give rise to a duty.

Section 324A, which Georgia has adopted as an accurate statement of the common law,[6] states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, *if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.*

(Emphasis supplied.) Section 324A of the Restatement (Second) of Torts. The Goodharts have not alleged that any of the three subsections of Section 324A apply to this case. Rather, they refer to Comment (b), which provides, "[t]his Section applies to any undertaking to render services to another, where the actor's negligent conduct in the manner of performance of his undertaking, or his failure to exercise reasonable care to complete it, or to protect the third person when he discontinues it,

---

[6] *Herrington v. Gaulden*, 294 Ga. 285, 287 (751 SE2d 813) (2013).

17

results in physical harm to the third person or his things." Section 324A, Comment (b). Thus, the Goodharts appear to construe Comment (b) to mean that the introductory clause of Section 324A stands alone, and that none of the three subsections need be satisfied. But reading Section 324A in this manner ignores the plain wording that liability may be incurred "*if*" one of the three stated grounds exists. Thus, the Goodharts must establish that one of the three subsections of Section 324A applies to this case and they have failed to do so.

As our Supreme Court has made clear, subsection (a) "applies only to the extent that the alleged negligence of the defendant exposes the injured person to a greater risk of harm than had existed previously." (Citation and punctuation omitted.) *Herrington v. Gaulden*, 294 Ga. 285, 288 (751 SE2d 813) (2013). Under this subsection, "[l]iability does not attach for failing to decrease the risk of harm. Put another way, the mere failure to abate a hazardous condition — *without making it worse* — does not trigger the application of Section 324A (a)." (Citations and punctuation omitted; emphasis supplied.) Id.[7] We find no evidence in the record that

[7] We note that the mere act of turning on the gas at the meter cannot be construed as increasing the risk because this act was not the allegedly negligent voluntary undertaking. See *Myers v. United States*, 17 F3d 890, 903 (6th Cir. 1994) (determining that under subsection (a), a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged *in the undertaking*).

18

AGL's allegedly negligent checks in the apartment worsened the condition of either the apartment or any appliance inside it. See id. (Section 324A (a) "applies when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed.") (citation and punctuation omitted); *Dale v. Keith Built Homes, Inc.*, 275 Ga. App. 218, 220 (620 SE2d 455) (2005) ("[F]ailing to take all possible actions to prevent an occurrence is not the same as increasing the risk of the occurrence.") (citation omitted). Further, we certainly cannot say that AGL created a risk with the loose flex connector behind the dryer because there is no evidence that AGL attached the connector in the first place, or ever adjusted it after the dryer was installed.

Subsection (b) does not apply here because there is no allegation that AGL completely undertook a duty which another party owed to Lauren. See *Fair v. CV Underground*, 340 Ga. App. 790, 796 (3) (798 SE2d 358) (2017) ("[A]ppellants do not allege that [the security company's] performance was to be substituted completely

Also, if we were to view the act of turning on the gas as increasing the risk, we would essentially be undercutting the general principle, discussed supra, that the gas company may turn on a customer's gas without inspecting the customer's gas appliances and pipes.

19

for that of the party on whose behalf the undertaking [was] carried out."); *Taylor v. AmericasMart Real Estate*, 287 Ga. App. 555, 559 (1) (b) (651 SE2d 754) (2007). Moreover, the record does not support this theory of liability because there is no indication that AGL conducted the checks in the apartment either for the landlord or any other party owing a duty to Lauren. As the record makes clear, AGL is not a code enforcement agency and its checks within a residence are predicated on its own policies. Also, AGL did not perform any checks at the landlord's request because the landlord never contacted AGL regarding Lauren's apartment. See, e.g., *Argonaut Ins. Co. v. Clark*, 154 Ga. App. 183, 186 (2) (267 SE2d 797) (1980) (subsection (b) would apply "only had the insurer contracted or agreed to supervise the construction work for [the construction company] and then performed negligently so as to cause the injury").

Lastly, subsection (c) is inapplicable because there is no evidence that Lauren, or another party owing her a duty, actually relied on AGL's voluntary checks in the apartment in 2010. See *BP Exploration & Oil, Inc. v. Jones*, 252 Ga. App. 824, 831 (2) (c) (558 SE2d 398) (2001) (subsection (c) "requires proof of actual reliance" on the undertaking) (physical precedent only). Our Supreme Court has recognized that "use by a third person of a defective instrumentality . . . in the manner in which such

20

instrumentality is customarily used, *where the fact of inspection is known to the third person* but the defect is unknown, demonstrates reliance by the third person upon the defendant's safety inspection of the defective instrumentality." (Emphasis supplied.) *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588, 591 (322 SE2d 269) (1984). Simultaneously, however, "conclusory facts [and] conclusions of law cannot be utilized to support or defeat motions for summary judgment. (Citation omitted.) *Johnson v. Metro. Atlanta Rapid Transit Auth.*, 230 Ga. App. 105, 106 (1) (495 SE2d 583) (1998).

We cannot simply assume that Lauren witnessed or even knew AGL performed checks in the residence when it connected the gas in 2010, especially because the service orders show that the gas service was not in Lauren's name, she was not the individual requesting that AGL turn on the gas, and there is no evidence that AGL in any way represented to Lauren that it had performed checks in the apartment. Thus, while Lauren may have in fact used the dryer, nothing in the record demonstrates that she relied on or knew of any checks performed by AGL. Compare *Underwood v. Select Tire, Inc.*, 296 Ga. App. 805, 812-813 (3) (676 SE2d 262) (2009) (truck owner relied on tire company's tire inspection where he asked whether the tires were "good" and explained how he planned to use them, and tire company inspected the tires and

21

represented to the truck owner that they were fit for use); *Smith*, supra, 253 Ga. at 588 (employee saw company representatives making inspections); *Cleveland v. Am. Motorists Ins. Co.*, 163 Ga. App. 748, 749 (295 SE2d 190) (1982) (fact issue regarding whether employees relied on voluntary inspection of boiler where affidavits indicated reliance, and inspector had issued a certificate of inspection memorializing each inspection and providing for the certificate to be conspicuously placed in the boiler room). See also *Howell v. United States*, 932 F2d 915, 919, n.5 (11th Cir. 1991) ("Even if we assume public knowledge that the FAA does periodically inspect planes for airworthiness, this generalized knowledge would not be sufficient to give rise to reliance under Georgia law. Especially where, as here, plaintiffs can point to no physical manifestations of reliance other than their decedents' use of the defective instrumentality, a more specific knowledge about the occurrence of the inspection seems to be required."). Given that the Goodharts identify no evidence of Lauren's reliance, or the reliance of a party owing her a duty, they cannot avail themselves of subsection (c), and the trial court properly determined that Section 324A is inapplicable in this case.

In sum, the Goodharts did not establish that AGL owed Lauren any duty under statute or case law, or incurred a duty pursuant to Section 324A of the Restatement

(Second) of Torts. As a matter of law, therefore, they failed to demonstrate that AGL was negligent, and the trial court correctly granted summary judgment in AGL's favor. Accordingly, we affirm.

*Judgment affirmed. Brown and Goss, JJ., concur*.